{¶ 1} In this original action, relator, Showa Aluminum Corporation of America, requests a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order awarding permanent total disability ("PTD") compensation to respondent Grover Annon ("claimant"), and to enter an order denying compensation.
 {¶ 2} This matter was referred to a magistrate of this court pursuant to Civ. R. 53 and Loc. R. 12(M) of the Tenth District Court of Appeals. The magistrate examined the evidence and issued a decision (attached as an appendix), including findings of fact and conclusions of law. Therein, the magistrate concluded that the commission interpreted the report of Dr. Murphy in a manner that creates equivocation. Therefore, the magistrate recommended that this court issue a writ of mandamus ordering the commission to vacate its order awarding PTD *Page 542 
compensation and, in a manner consistent with the magistrate's decision, enter a new order either granting or denying the PTD application.
 {¶ 3} Respondent makes no stated objections but generally argues that the magistrate read equivocation into the report of Dr. Murphy. Respondent also contends that the magistrate erroneously concluded that the commission improperly used Dr. Gaines's medical report as the start date of PTD compensation.
 {¶ 4} Upon review, and for the reasons set forth in the magistrate's decision, we do not find respondent's position to be well taken. Following an independent review of the matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, respondent's objections to the magistrate's decision are overruled, and we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we issue a limited writ of mandamus ordering the commission to vacate its order awarding PTD compensation and, in a manner consistent with the magistrate's decision, enter a new order either granting or denying the PTD application.
Objections overruled and writ granted.
PETREE and KLATT, JJ., concur.
 APPENDIX
MACKE, Magistrate.
 {¶ 5} In this original action, relator, Showa Aluminum Corporation of America, requests a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order awarding permanent total disability ("PTD") compensation to respondent Grover Annon ("claimant"), and to enter an order denying that compensation.
Findings of Fact:
 {¶ 6} 1. Claimant sustained two industrial injuries while employed as a "jig operator" for relator, a self-insured employer under Ohio's workers' compensation laws.
 {¶ 7} 2. Claimant's April 28, 2003 injury is allowed for "right shoulder sprain, right trapezius strain" and is assigned claim number 03-843544.
 {¶ 8} 3. Claimant's July 28, 2000 injury is allowed for "tendonitis left hand, neuropathy left ulnar nerve; left cubital tunnel syndrome; bilateral carpal tunnel syndrome; right cubital tunnel syndrome/right ulnar neuropathy; major depressive disorder" and is assigned claim number 00-498294. *Page 543 
 {¶ 9} 4. On August 15, 2006, claimant filed an application for PTD compensation.
 {¶ 10} 5. In support of his application, claimant submitted a report dated June 9, 2006, from attending physician Steven T. Gaines, M.D.:
 I do feel as of May 01, 2006, Mr. Grover Annon has reached maximum medical improvement. I do feel that he is permanently and totally disabled from all gainful employment as a result of the injuries to his arms.
 He continues to have some pain with the elbows that presents itself predominantly in the forearms, volarly and ulnarily. He still gets some numbness in the fingers. He still has some weakness in his hands and arms. I think at his age it is highly unlikely that he would be able to perform any activity or work that requires use of his arms on any repetitive basis. I certainly do not feel that he is capable of any heavy physical labor which he has performed throughout most of his adult life.
 Please note that his problems have required surgery, which ultimately was performed on the right elbow on May 10, 2005 and on the left elbow on October 04, 2005.
 {¶ 11} 6. Under the "education" section of the PTD application, claimant indicated that he had graduated from high school in 1961. The application form also posed three questions: (1) "Can you read?" (2) "Can you write?" and (3) "Can you do basic math?" Given a choice of "yes," "no" and "not well," claimant selected the "not well" response for the first and second queries and the "yes" response for the third query.
 {¶ 12} The PTD application form asks the claimant to provide information regarding his work history. Claimant indicated that he was employed as a jig operator with relator from August 1997 to April 28, 2003. He described the basic duties of his job as jig operator:
 My job was to jig air conditioners for cars [and] trucks. I lifted the air conditioner off the conveyor system [and] place in a special jig for each model of air conditioner. [Straighten and] make cores flat by bending and patting sides using my hands — straighten brackets [and] inlet and outlet tubes — make sure they fit perfectly into the jig [and] then put back onto conveyor system.
 {¶ 13} 7. On December 11, 2006, at relator's request, claimant was examined by neurologist Gerald S. Steiman, M.D. In his report dated December 15, 2006, Dr. Steiman stated:
 Mr. Annon's history, medical record review, physical exam and pain assessment provides strong credible objective evidence that he is not incapable of returning to sustained remunerative employment as a result of the physical conditions within claims 00-498294 and 03-843544. *Page 544 
 Mr. Annon's history, medical record review, physical exam and pain assessment fails to provide credible objective evidence which would preclude his ability to return to his prior job activity. Mr. Annon does have evidence of a medical impairment but that medical impairment does not appear work prohibitive when considering the specifics of his job performance.
 {¶ 14} 8. Also on December 11, 2006, at relator's request, claimant was examined by psychiatrist Richard H. Clary, M.D. In his report dated December 12, 2006, Dr. Clary stated:
 In my medical opinion, he has reached maximum medical improvement. Mr. Annon reports that there are many activities and things that he would like to do and indicated that his only limitation is the result of his pain. He has not lost interest in his usual activities which would be the case with a more severe depression. In my medical opinion, his depression is not work prohibitive and does not cause permanent total disability. He enjoys boating and fishing and is able to mow his yard, but again, he has to limit his activities and take frequent rest periods because of his pain. In my medical opinion, the allowed psychiatric condition results in a permanent partial impairment of 10 percent of the whole person based on the AMA Guides Fifth Edition. In my medical opinion, it would be appropriate for Mr. Annon to continue taking antidepressant medication. In my medical opinion, additional treatment with a psychologist is not appropriate and is not indicated for the allowed condition in this claim. In my medical opinion, review of medical records indicate that Mr. Annon has a tendency to exaggerate his symptoms.
 {¶ 15} 9. In further support of his PTD application, claimant submitted a report dated February 6, 2007, from psychologist Donald Jay Weinstein, Ph.D. In his report, Dr. Weinstein indicated that he had reviewed Dr. Clary's December 12, 2006 report. Dr. Weinstein concluded: "I do not believe that Mr. Annon is exaggerating. Furthermore, I do not believe that Mr. Annon has had ample time in consistent psychotherapy to declare him MMI."
 {¶ 16} 10. On February 27, 2007, at the commission's request, claimant was examined by orthopedist William Reynolds, M.D. In his narrative report dated March 1, 2007, Dr. Reynolds opined:
 It is my opinion that the injured worker has reached a level of MMI regarding each specific allowed condition.
 Using the AMA Guides, 5th Edition, his impairment of function as relates to the right shoulder strain, right trapezius strain is 9%. Impairment of function as relates to the tendonitis left hand and the bilateral carpal tunnel syndrome, the impairment of function of the man as a whole is 6%. As relates to the left ulnar nerve neuropathy, left cubital tunnel syndrome, right cubital tunnel *Page 545 
syndrome, and right ulnar neuropathy, impairment of function of the man as a whole is 8%. This translates to a combined effects permanent partial impairment of function of the man as a whole of 22%.
 {¶ 17} 11. On February 27, 2007, Dr. Reynolds completed a physical-strength rating form. On the form, Dr. Reynolds indicated by checkmark that claimant is capable of "sedentary work." Where the form invites the physician to note further limitations, Dr. Reynolds wrote: "No repetitive arm work activity or working overhead [with right] upper extremity."
 {¶ 18} 12. On February 27, 2007, at the commission's request, claimant was examined by psychologist Michael A. Murphy, Ph.D. In his report dated March 6, 2007, Dr. Murphy states:
 Chief Complaints: The Injured Worker's chief complaints revolve around upper extremity pain.
 History of Present Illness: The Injured Worker was employed by Showa Aluminum Corporation of America as a jig operator at the time of the 4/28/03 injury. He states, "The table was too tall and when I reached over the table it moved on wheels so I had to hold the table and the job at the same time." He was also injured on 7/28/00. He states, "I injured my left hand and arm pulling and lifting and twisting pipes all day on bad parts." He was off work for ten months following the 2003 injury. The company did not offer light duty employment. He last worked 4/28/03.
 * * *
 Educational History: Educationally, the Injured Worker completed high school. He attended produce seminars and had an insurance license (now expired). He describes himself as an average student. There were no grade failures. He denies any behavioral problems in school. He was involved in football in high school. He sustained a head injury playing football at age 16. He states, "I was knocked off my cleats. I hit my head. The scar was clamped and I had a skull cast for six weeks."
 * * *
 Mental Status Examination: Cognitively, the Injured Worker appears to be a man of average intelligence. He is alert, oriented in all spheres, with adequate reality contact. Concentration and attention are unimpaired. He is not distracted by pain. He reports that medications do not interfere with concentration. Comprehension of simple commands is unimpaired. Comprehension of complex commands is unimpaired. Stream of thought and flow of ideas are normal and coherent. Educational deficits are absent. There is no evidence of neurological impairment. There is no evidence of cognitive dysfunction due to psychoses, head injury, or organicity. He shows no obsessions, phobias, ideas *Page 546 
of reference, or delusions. He denies delusions, obsessive ruminations, or hallucinations. His thoughts are clear, understandable, relevant, and goal-directed. Paranoid ideations are absent. There is no tangentiality, circumstantiality, disturbances of logic, or distractibility. His associations are reasonably well organized. The Injured Worker answers questions appropriately. Memory functions are generally intact in all time frames. However, mild and intermittent deficits short-term memory are reported. He states, "I'm forgetful." Long-term memory is intact. The Injured Worker is able to recall time frames. He gives a reasonable account of his life events in chronological order. He is a good historian. He reports that medications do not interfere with memory functions. Abstract reasoning, concept formation, and fund of knowledge are estimated to be within normal limits. He has a functional understanding of everyday objects. His judgement is not impaired. Executive functions (i.e., decision-making, flexibility, social perceptions) are intact and estimated to be within normal limits. The Injured Worker has had a history of dysfunctional marriages. Insight is limited. The Injured Worker is psychologically minded.
 Mood and Affect (injury-specific): Affectively, the Injured Worker reports a chronic depressed mood. He states, "I planned on a nice retirement. Then I got hurt." He reports depression daily. Depressive cognition is present, including feelings of helplessness. He reports feeling good periodically. He states, "For two or three hours." He reports having little or no desire, a loss of pleasure, and feeling irritable, guilty, and downhearted. He states, "I'm frustrated." He reports depression for the past three years, since his 2002 hand surgery. He denies previous episodes of depression. He reports periodic crying spells, and was tearful when discussing ulnar nerve surgeries. He denies any suicidal ideation, intent, or plan. He denies symptoms of anxiety. Psychomotor retardation and agitation are absent. Symptoms of post-traumatic stress, acute stress, phobic tendencies, and manic episodes are absent. He denies having mood swings. He does not exhibit an inflated self-esteem. The Injured Worker denies symptoms of impulse control behavior and antisocial behavior.
 * * *
 Adaptation (ability to respond appropriately to changes in the work place): The Injured Worker's work history is good. He is able to maintain attendance, perform the normal duties of his former job or another job within restrictions, use public transportation, use his own transportation, be aware of normal hazards, follow safety procedures, deal with supervisors, deal with coworkers, and work under specific instructions. The Injured Worker is aware of safety issues. He is able to follow normal directions. He does require supervision. *Page 547 
He would function best under low-moderate stress conditions with simple work tasks. The Injured Worker's presentation of psychological symptoms is consistent with his allowed psychological condition.
 Impairment: Mild
 Concentration, Persistence, and Pace: The Injured Worker is able to sustain focus or attention long enough to permit completion of tasks in a suitable work environment. He is able to complete a normal workday and work week and maintain regular attendance from a psychological standpoint.
 Impairment: Mild
 * * *
 Discussion: The Injured Worker has been prescribed Effexor since 2002. More recently, he has begun psychotherapy. At one point he removed himself from Effexor, but became agitated and was restarted. The Injured Worker's presentation of his marriage was somewhat confused and he is now in his fourth marriage. His present wife is now retired due to her own back surgery. The Injured Worker reports multiple unrelated health issues (i.e., hypertension; colon resection, 2001; prostate treatment, 2003; recent colonoscopy for cancer follow-up, 2006; and bilateral hearing loss). His residual impairment from a psychological stand-point is mild. He fishes and uses a lawn mower. His social capacities are not altered by the injury and his cognitive capacities are mildly impaired. Psychological testing indicates his depression does not interfere with his daily responsibilities.
 * * *
 Opinion: The following opinion is based on a reasonable degree of psychological certainty.
 Question 1: Has the Injured Worker reached a maximum medical improvement?
 The Injured Worker is at maximum medical improvement. His depression is mild. He has been prescribed Effexor for almost five years.
 * * *
 Question 3: What is the Injured Worker's occupational activity capacity?
 The Injured Worker's depression is mild and not work prohibitive. From a psychological perspective he is able to function in his former capacity.
(Emphasis sic.)
 {¶ 19} 13. On March 7, 2007, Dr. Murphy completed an occupational-activity assessment form. The form asks the examining psychologist to select among three preprinted responses describing the claimant's ability or inability to work: *Page 548 
Based solely on the impairment resulting from the allowed mental and behavioral condition(s) in this claim within my specialty, and with no consideration of the injured worker's age, education, or work training:
 ) This injured worker has no work limitations.
 ) This injured worker is incapable of work.
 ) This injured worker is capable of work with the limitations(s)/modification(s) noted below.
 {¶ 20} Dr. Murphy selected the first preprinted response, stating, "This injured worker has no work limitations." Where the form invites the examining psychologist to state remarks, Dr. Murphy wrote: "(See Report)."
 {¶ 21} 14. In further support of his PTD application, claimant submitted a report dated April 30, 2007, from psychologist Beal D. Lowe, Ph.D., who is also a vocational expert. The four-page report is captioned "Employability Assessment." The report states in part:
 TEST RESULTS
 The Logical Memory Subtest of the Wechsler Memory Scale was administered to assess practical memory. This assessment has an individual listen to a paragraph which is read to him and then indicate details which are remembered. Mr. Annon remembered only 9 details while the average for persons of his age is 26. Mr. Annon's performance indicates very poor working memory, despite good effort.
 A Short Form of the WAIS-R was administered to screen for basic intelligence. Mr. Annon's score on this instrument indicates a full-scale IQ of approximately 80, placing him in the Low Average/Borderline range. The Digit Span Subtest of the WAIS-R was administered. Mr. Annon performed at a very deficient level. He was able to remember only 3 numbers forwards and 2 backwards. This performance places him at approximately the 5th percentile.
 DISCUSSION/CONCLUSIONS
 This assessment finds Mr. Annon to be permanently and totally disabled as a result of his physical functional restriction to limited Sedentary employment and with consideration given to his tested deficiencies in memory and his Low Average/Borderline level of intelligence.
 Dr. Reynolds has found Mr. Annon to possess physical capacity only for Sedentary employment which would not involve "repetitive motor activity or working overhead with the right upper extremity." This physical assessment indicates that Mr. Annon lacks capacity to perform any Sedentary industrial production work, and many other types of Sedentary employment, which would require repetitive movement with his injured right, dominant, hand and arm. *Page 549 
Psychological and psychiatric evaluations by Drs. Murphy and Clary have indicated no functional limitations arising from Mr. Annon's allowed psychological condition. Both exams found only mild memory problems. Neither clinical examination included memory testing.
 Testing conducted as part of the present examination finds Mr. Annon to have very deficient practical and immediate memory, with scores placing him at the 5th percentile. Screening for basic intelligence indicates a full-scale IQ of approximately 80, placing him in the Low Average/Borderline range. Mr. Annon was observed to put good effort into this testing. These tested deficiencies indicate that Mr. Annon lacks capacity at this time to learn to perform any Sedentary retail or clerical occupation. While, approximately 15 years ago, Mr. Annon had the academic and intellectual capacity to pass the Ohio licensing exam to sell life insurance, current test results indicate that he no longer possesses capacity to perform at that level. Academic and intellectual testing at this time, when Mr. Annon is 64 years old, find that his current memory deficits make it impossible for him to learn to perform, or to consistently perform, any Sedentary retail or clerical occupation. The causes for this apparent intellectual decline are unknown, and may reflect aging and the effects of his allowed depressive condition. Mr. Annon was observed to put good effort into testing and to be embarrassed by his poor results.
 In summary, this assessment finds Mr. Annon, at age 64, to be permanently and totally disabled as a result of his physical functional restriction to Sedentary employment which would not require repetitive use of his dominant hand and as a result of memory and intellectual deficits found in objective testing which would make him unable to learn new clerical or retail tasks.
 {¶ 22} 15. Following a June 8, 2007 hearing, a staff hearing officer ("SHO") issued an order awarding PTD compensation beginning June 9, 2006. The SHO's order explains:
 This order is based on the reports of Drs. Murphy, Reynolds, and Mr. Lowe. The injured worker has incurred two industrial injuries. The first injury was a 07/08/2000 injury involving injured worker's hands and elbows. This was a repetitive trauma injury that was allowed for BILATERAL CARPAL TUNNEL SYNDROME, TENDONITIS LEFT HAND, NEUROPATHY LEFT ULNAR NERVE, LEFT CUBITAL TUNNEL SYNDROME AND RIGHT CUBITAL TUNNEL SYNDROME/RIGHT ULNAR NEUROPATHY. The claim was later amended to add MAJOR DEPRESSIVE DISORDER. The injured worker had four surgeries because of this claim. The second injury was a 2003 right shoulder-trapezius injury. All treatment for this claim was conservative with no surgeries being reported. The injured worker has not worked since this injury occurred. *Page 550 
 Based on the reports of Drs. Murphy and Reynolds it is concluded that injured worker has the residual ability to perform sedentary work that is non arm repetitive and injured worker is further barred from working overhead with his right upper arm. Further, based on Dr. Murphy's report the injured worker is restricted to simple work tasks involving low to moderate stress.
 Because the injured worker does have residual working abilities, his disability factors are next reviewed to determine what impact those factors have on injured worker's overall ability to perform sustained remunerative employment. In that light the record reveals the following disability factors: the injured worker is 64 year[s] old, he is a high school graduate, and he has worked as a jig operator, insurance agent, delivery driver, and grocery produce manager.
 The injured worker's age is found to be a negative factor. At age 64 the injured worker would be considered an elderly worker with very little potential time left in the work force. For these reasons his age would clearly be a disadvantage to him being reemployed.
 The injured worker's education, high school, is determined to be a neutral factor. The injured worker does possess basic literacy skills, however, he has no technical skills or college degrees. Further, per Mr. Lowe's 2007 employment assessment, the injured worker's has an IQ of 80. An IQ this low would make it difficult for injured worker to learn new job skills. Therefore, his education-intellect would only lead itself to injured worker qualifying for simple entry level sedentary jobs at best.
 The injured worker's job history is also found to be a neutral factor. The injured worker's prior job as an insurance agent would have given him some sedentary job skills. However, it should be noted that injured worker has not worked as an insurance agent for ten years, therefore, his sedentary work skills are remote in nature and said skills would not consequently readily transfer due to this time gap.
 In summary, it is initially noted that due to injured worker's restrictions his potential list of employment possibilities would be very limited. When injured worker's severely limited potential employment possibilities are combined with his relatively advanced age, limited education, and time remote sedentary job skills, it is reasonable to conclude that injured worker is prevented from ever engaging in sustained remunerative employment.
 For purposes of completeness the following issues raised by employer's counsel are ruled on as follows. Dr. Gaines' 06/09/2006 report, which was the report used to support the IC-2 application was objected to as invalid because Dr. Gaines in this report references injured worker's age in a discussion of injured worker's ability to work. *Page 551 
 While it is true that in the second paragraph of this report Dr. Games' does state that at injured worker's age it would be unlikely injured worker's could perform repetitive work, it is also noted that in the first paragraph of this report Dr. Gaines stated that injured worker was permanently and totally disabled from all gainful employment as a result of his arm injuries.
 Therefore, it is clear that Dr. Gaines does opine that injured worker is permanently totally disabled solely due to injured worker's allowed arm injuries without reference or consideration of injured worker's age or other disability factors. For that reason his report is accepted as valid.
 Employer's counsel also objected to consideration of Mr. Lowe's 05/03/2007 employability assessment report. Employer's counsel argued that the report was a medical report and therefore not timely submitted pursuant to OAC 4121-3-34. This objection is denied because in the body of this report Mr. Lowe reviews injured worker's education, work history, and intelligence levels and after taking all of these vocational factors into account concludes that injured worker is permanently totally disabled.
 Therefore, based on a close reading of this report, it is evident that said report is only a vocational-employability report as no medical
opinions are contained in said report. Consequently, Dr. Lowe's report was considered herein as it is a vocational, not medical report.
 This award is to be paid as follows: 75% of the benefits are to be paid in claim 00-98294 and 25% of the benefits are to be paid in claim 03-843544.
 This allocation is based on Dr. Reynolds report wherein he attributes the majority of injured worker's disability to claim 00-498294. Further, claim 00-498294 also includes the psychological allowance making it the primary reason why injured worker is disabled.
 The start date of 06/09/2006 is based on Dr. Gaines' report of such date. This report is the earliest medical evidence of permanent total disability.
(Emphasis sic.)
 {¶ 23} 16. On August 23, 2007, the commission mailed an order denying relator's request for reconsideration of the SHO's order of June 8, 2007.
 {¶ 24} 17. On September 10, 2007, relator, Showa Aluminum Corporation of America, filed this mandamus action.
Conclusions of Law:
 {¶ 25} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 26} Equivocal medical opinions are not evidence. State ex rel. Eberhardt v. Flxible Corp.
(1994), 70 Ohio St.3d 649, 657, 640 N.E.2d 815. *Page 552 
Equivocation occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement. Id. Ambiguous statements, however, are equivocal only while they are unclarified. Id.
 {¶ 27} Only the doctor who rendered ambiguous statements can clarify his ambiguous statements. State exrel. Petronio v. Indus. Comm. (1999), 84 Ohio St.3d 427,704 N.E.2d 1225 (the Eberhardt rule required the commission to accept Dr. Muehrcke's explanation of his conflicting reports notwithstanding the commission's authority to determine credibility).
 {¶ 28} It follows from the Eberhardt rule that the commission cannot interpret a medical report in a manner that creates equivocation as to the relied-upon portion of the report. See State ex rel. Sears Roebuck Co. v. Indus.Comm., Franklin App. No. 05AP-1135, 2007-Ohio-838,2007 WL 611976, at ¶ 41 (the commission was not required to read Dr. Rutherford's report in a manner that creates equivocation).
 {¶ 29} Here, the commission, through its SHO, interpreted Dr. Murphy's report in a manner that creates equivocation as to the relied-upon portion of Dr. Murphy's report.
 {¶ 30} The commission interpreted the following statement from Dr. Murphy's report as a medical restriction on work activity: "He would function best under low-moderate stress conditions with simple work tasks."
 {¶ 31} The above-quoted statement was viewed by the commission as a work restriction even though Dr. Murphy concludes in the last paragraph of his narrative report that the depression is not work prohibitive and that claimant is able to function in his former capacity. The above-quoted statement was viewed as a work restriction even though Dr. Murphy indicated on the occupational activity assessment form that claimant "has no work limitations."
 {¶ 32} When the commission viewed the above-quoted statement from Dr. Murphy as a work restriction, it created an equivocation because the commission's interpretation conflicts with Dr. Murphy's conclusions, which are set forth in the final paragraph of his narrative report and his occupational-activity assessment.
 {¶ 33} In the magistrate's view, the above-quoted portion of Dr. Murphy's report need not be interpreted in a manner that creates a conflict with Dr. Murphy's conclusion that claimant "has no work limitations" or his conclusion that claimant is able to function in his former capacity. Dr. Murphy's report is not, on its face, equivocal and should remain available for further evidentiary consideration by the commission. *Page 553 
 {¶ 34} Given that the commission cannot rely upon the interpretation that it gave to Dr. Murphy's report, the commission abused its discretion in its determination of claimant's residual medical capacity. Because the commission abused its discretion in determining claimant's residual medical capacity, it would be premature for this court to review the commission's nonmedical analysis or the report upon which it relied for that analysis. State ex rel. Corona v. Indus.Comm., (1998), 81 Ohio St.3d 587, 692 N.E.2d 1017. Thus, the issues relating to Dr. Lowe's report are not before this court in this action. Id.
 {¶ 35} The magistrate shall briefly address an issue that the parties do not raise. The SHO's order states that the PTD start date of June 9, 2006, is based upon Dr. Gaines's report, even though the order previously states that it "is based on the reports of Drs. Murphy, Reynolds, and Mr. Lowe." Neither the commission nor the claimant argue here that the commission's PTD award can be saved solely by reliance upon Dr. Gaines's report. While it is conceivable that the commission could articulate an alternative basis for the PTD award, it has not successfully done so by starting PTD compensation as of the date of Dr. Gaines's report. See State ex rel. Speelman v.Indus. Comm. (1992), 73 Ohio App.3d 757, 761,598 N.E.2d 192 (it is not improper to state alternative grounds for supporting the order, but those grounds should not be merged together and should be explained separately so that a reviewing court can understand what has been done).
 {¶ 36} The SHO's statement that the order "is based on the reports of Dr[s]. Murphy, Reynolds, and Mr. Lowe" is contradicted by the selection of a PTD-compensation start date based upon Dr. Gaines's report. The commission cannot start PTD as of June 9, 2006, unless Dr. Gaines's report alone supports PTD as of June 9, 2006, because both Drs. Murphy and Reynolds examined after that date. See State ex rel.Wheeling-Pittsburgh Steel Corp. v. Indus. Comm., Franklin App. No. 05AP-913, 2006-Ohio-3912, 2006 WL 2130720.
 {¶ 37} In the magistrate's view, the question of whether Dr. Gaines's report alone provides the some evidence to sustain the award is not before this court given the confusion created in the order when Dr. Gaines's report is not among the listing of those reports that the order says it is based upon. See State ex rel. Fultz v. Indus. Comm. (1994),69 Ohio St.3d 327, 631 N.E.2d 1057.
 {¶ 38} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate its order awarding PTD compensation and, in a manner consistent with this magistrate's decision, enter a new order either granting or denying the PTD application. *Page 554