[Cite as *Hobart v. Indus. Comm.*, 2018-Ohio-2853.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| [State of Ohio ex rel.]<br>Mary C. Hobart, | : | |
| | : | |
| Relator, | : | |
| | : | No. 17AP-326 |
| v. | : | (REGULAR CALENDAR) |
| Industrial Commission of Ohio<br>and Pure Foods, LLC, | : | |
| | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on July 19, 2018

**On brief:** *Anthony P. Christine*, for relator.

**On brief:** *Michael DeWine*, Attorney General, and *Crystal R. Richie,* for respondent Industrial Commission of Ohio.

IN MANDAMUS
ON OBJECTION TO THE MAGISTRATE'S DECISION

DORRIAN, J.

{¶ 1} Relator, Mary C. Hobart, has filed this original action requesting this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its December 13, 2016 order that denied her application for permanent total disability ("PTD") compensation, and to enter a new order granting her application.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto. The magistrate recommends this court

grant the request for a writ of mandamus.  Specifically, the magistrate found the reports of Dr. Steven A. Cremer do not provide some evidence on which the commission could rely in determining residual functional capacity.

{¶ 3}  The commission has filed the following objection to the magistrate's decision: The Magistrate Erred By Re-weighing The Medical Evidence.

{¶ 4}  The magistrate stated the main issue is "whether the reports of Dr. Cremer provide some evidence on which the commission exclusively relied in determining residual functional capacity [pursuant to] Ohio Adm.Code 4121-3-34(B)(4)."  (Appended Mag. Dec. at ¶ 31.)  The commission generally argues the magistrate impermissibly reweighed the evidence and determined that the medical reports of Dr. Cremer were not some evidence upon which the commission could rely to determine residual functional capacity and, in doing so, the magistrate exceeded the appropriate level of review.  The commission urges this court to reject the magistrate's decision to issue the writ of mandamus and to find that Dr. Cremer's reports is some evidence upon which the commission could rely to deny relator's application for PTD compensation.

{¶ 5}  The commission makes several specific arguments in support of its objection. First, the commission takes issue with the magistrate's analysis:

> Analysis begins with the observation that relator has no industrial injury or impairment to her non-dominant left upper extremity.  In rendering an opinion on the "Physical Strength Rating" form regarding the Ohio Adm.Code 4121-3-34(B)(2) classification of physical demands of work, the examining physician should consider to what extent, if any, the non-dominant left upper extremity might be useful in the performance of sedentary and/or light work. Here, Dr. Cremer does not directly address how the left upper extremity might assist the right upper extremity in the performance of the physical demands of work.
>
> Based solely on the reports of Dr. Cremer, it is difficult to see how the severe right upper extremity impairment alone permits any light work.

(Appended Mag. Dec. at ¶ 36-37.)

{¶ 6} The commission construes this analysis as the magistrate creating a new standard that: (1) the examining physician "should consider" the usefulness of a non-allowed condition in the performance of the physical demands of work, and (2) the examining physician should make such a notation on the physical strength rating form in violation of the requirements to provide an opinion as to the claimant's ability to work "[b]ased solely on impairment due to the allowed condition(s) in the claim." (Comm. Obj. at 4.) Such a standard, according to the commission, violates the rule outlined in *State ex rel. Waddle v. Indus. Comm.*, 67 Ohio St.3d 452 (1993), that non-allowed conditions cannot be used to advance or defeat a claim for PTD compensation. *Waddle* stated that " '[e]ntitlement to permanent total disability compensation requires a showing that the medical impairment due to the allowed conditions, either alone or together with nonmedical disability factors, prevents claimant from engaging in sustained remunerative employment.' " *Id.* at 455, quoting *State ex rel. LTV Steel Co. v. Indus. Comm.*, 65 Ohio St.3d 22, 24 (1992). We disagree with the commission that *Waddle* prohibits, in this case, consideration of how the left upper extremity might assist the right upper extremity in the performance of the physical demands of light work. Such consideration is not the same as consideration of a non-allowed condition as the basis of an award for PTD. To the contrary, focusing solely on the impairment due to the allowed condition of the upper right extremity, Dr. Cremer opined there was a 43 percent upper extremity impairment which is equivalent to a 26 percent whole person impairment. The magistrate's analysis does not violate *Waddle*. Furthermore, we do not construe the magistrate's analysis as creating a new standard but, rather, as an observation regarding how the left upper extremity might assist the right upper extremity in this case given Dr. Cremer's restrictions on the right upper extremity.

{¶ 7} Second, the commission argues that contrary to the magistrate's conclusion, "Ohio Adm.Code 4121-3-34(B)(2) does not require Dr. Cremer to 'consider to what extent, if any, the non-dominant left upper extremity might be useful in the performance of sedentary and/or light work,' " but, rather, simply classifies the physical demands of particular types of work. (Comm. Obj. at 4, quoting Appended Mag. Dec. at ¶ 36.) However, while Ohio Adm.Code 4121-3-34(B)(2) does not require consideration of how the left upper extremity might assist the right upper extremity in the performance of the physical

demands of work, in this case, such consideration would have served to explain how relator could or could not comply with the demands of light-duty work given Dr. Cremer's restrictions on the right upper extremity.

{¶ 8} Third, the commission argues the magistrate improperly determined that Dr. Cremer's opinion failed to meet the criteria for light-duty work and to observe that Dr. Cremer's restrictions against repetitive gripping, pulling, or pushing is inconsistent with the definition of light work as defined in Ohio Adm.Code 4121-3-34(B). The commission points to *State ex rel. Rice v. J.P. Industries, Inc.*, 10th Dist. No. 97APD01-3 (Feb. 10, 1998) (memorandum decision) for the proposition that a physician may choose a category of work as set forth in Ohio Adm.Code 4121-3-34(B) and, at the same time, limit certain physical activities within that category. According to the commission, an injured worker need not be able to perform every job within a particular work category. However, we are mindful of our conclusion in *State ex rel. O'Brien v. Cincinnati Inc.*, 10th Dist. No. 07AP-825, 2008-Ohio-2841, ¶ 10, that the commission cannot simply rely on a physician's "bottom line" identification of an exertional category without examining the specific restrictions imposed by the physician to make certain that any physical restrictions the physician lists correspond with an ability to actually perform at the exertional level indicated by the physician. Dr. Cremer imposed several restrictions: "[n]o repetitive gripping, pulling or pushing with [right] hand. No weight bearing on right hand." (Appended Mag. Dec. at ¶ 26.) Examination of the specific restrictions imposed by Dr. Cremer was not improper.

{¶ 9} Finally, the commission argues the commission may accept all, none, or any portion of any expert report and is not required to give special weight to any particular vocational or medical report. *State ex rel. Ellis v. McGraw Edison Co.*, 66 Ohio St.3d 92 (1993). However, as noted above, the commission must examine the specific restrictions imposed by a physician and actually make certain that such restrictions correspond with an ability to actually perform at the exertional level indicated by the physician. Furthermore, in issuing the writ of mandamus, we are not, as the commission suggests, second-guessing the medical correctness of Dr. Cremer's opinion but, rather, requiring the commission to conduct such examination.

{¶ 10} Upon review of the magistrate's decision, an independent review of the record, and due consideration of the commission's objection, we find the magistrate has

properly determined the pertinent facts and applied the appropriate law. We therefore overrule the commission's objection to the magistrate's decision and adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. Accordingly, the requested writ of mandamus is hereby granted.

*Objection overruled;*
*writ of mandamus granted.*

BROWN, P.J., and BRUNNER, J., concur.

_____

# APPENDIX

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Mary C. Hobart, | : | |
| Relator, | : | |
| v. | : | No. 17AP-326 |
| Industrial Commission of Ohio and | : | (REGULAR CALENDAR) |
| Pure Foods, LLC, | : | |
| Respondents. | : | |

## MAGISTRATE'S DECISION

### Rendered on February 6, 2018

*Anthony P. Christine,* for relator.

*Michael DeWine*, Attorney General, and *Crystal R. Richie,* for respondent Industrial Commission of Ohio.

## IN MANDAMUS

{¶ 11} In this original action, relator, Mary C. Hobart, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its December 13, 2016 order that denies her application for permanent total disability ("PTD") compensation, and to enter an order granting the application.

Findings of Fact:

{¶ 12} 1. On January 3, 2014, relator injured her right hand while employed as a "plater" for respondent Pure Foods, LLC, a state-fund employer. The industrial claim (No. 14-30018) is allowed for:

Contusion of right fourth finger; closed fracture distal phalanx right hand second finger; crushing injury right second finger; crushing injury right fourth finger; right carpal tunnel syndrome; trigger finger right fourth finger.

{¶ 13} 2. Relator began receiving temporary total disability ("TTD") compensation.

{¶ 14} 3. On November 24, 2015, at the request of the Ohio Bureau of Workers' Compensation ("bureau"), relator was examined by Karen Gade-Pulido, M.D. In her four-page narrative report, Dr. Gade-Pulido states:

> **History according to the injured worker**
> Ms. Hobart is a 75-year-old, right-hand-dominant female who reports that she was injured while working on a conveyor line distributing food when the ceiling sprung a leak and her boss asked that they remove the food towers. She was rolling these out with the help of a colleague who smashed the right hand in between two of the towers. She went to the ER and was diagnosed with a hand fracture. She had the hand splinted and was eventually referred to therapy. Despite this, she continued to have persistent hand pain and developed triggering of the 4th digit. She ultimately had a surgical release of the carpal tunnel and the right 4th trigger finger. This surgery was performed a year ago and has been followed by extensive therapy. * * *
>
> She lives alone and manages all of her activities of daily living on her own. She continues to drive. She uses her left hand for driving. She has not returned to work since this injury and feels that she cannot return to work given her right-hand-dominance and continued symptoms in the right hand. She does not believe that she is young enough to consider taking some other job, unless it were to be just sitting and answering a phone.
>
> She reports residual numbness in the right 4th finger and burning in the right palm. She also has scar tissue that makes her hand feel tight and stiff. She runs the hand under warm water in the mornings to reduce the stiffness. She notes persistent swelling on the dorsum of the right hand. She rates her hand pain as 6-8/10, which she states is constant. She takes Tylenol and Lodine for the pain, noting multiple allergies to other medications.

{¶ 15} Further in her report, Dr. Gade-Pulido responds to several questions posed by the bureau. Dr. Gade-Pulido responds as follows:

Ms. Hobart has been through an extensive course of treatment for the allowed conditions in this industrial claim, including surgery and extensive therapy. While she continues to report some stiffness and reduced sensation in the right hand, additional treatment at this time is unlikely to result in any fundamental functional or physiological change. She is consequently at MMI for the conditions allowed in this industrial claim.

* * *

She is at MMI as of 9/29/15 when she completed her functional capacity evaluation.

* * *

She has received extensive treatment. Additional treatment at this time is unlikely to result in additional change. A request has been submitted for a paraffin bath. While this may help with her symptoms of stiffness in the mornings, it is unlikely to result in overall change in her condition and does not impact her MMI status.

* * *

She is not likely to be able to resume her former position of employment, given the repetitive demands of that position on her affected right upper extremity.

* * *

The treatment to date has been medically necessary and appropriate. Additional treatment at this time is not indicated.

* * *

There are no additional diagnostic or treatment services recommended relative to the allowed conditions in this industrial claim.

* * *

Vocational rehabilitation is not indicated at this time.

{¶ 16} 4.  On December 30, 2015, citing the report from Dr. Gade-Pulido, the bureau moved for the termination of TTD compensation.

{¶ 17} 5.  Following a February 9, 2016 hearing, a district hearing officer ("DHO") issued an order terminating TTD compensation as of the hearing date on grounds that the industrial injury has reached maximum medical improvement ("MMI").  In support, the DHO relied exclusively on the report of Dr. Gade-Pulido.

{¶ 18} 6.  Relator administratively appealed the DHO's order of February 9, 2016

{¶ 19} 7.  Following a March 21, 2016 hearing, a staff hearing officer ("SHO") issued an order affirming the DHO's order.  The SHO also relied exclusively on the report of Dr. Gade-Pulido in determining that the industrial injury has reached MMI.

{¶ 20} 8.  On April 12, 2016, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of March 21, 2016.

{¶ 21} 9.  On April 23, 2016, at relator's request, she was examined by chiropractor, John J. Clendenin, D.C.  In his three-page narrative report, Dr. Clendenin states:

> **HISTORY:** Ms. Hobart was injured when her right hand was smashed between the two towers causing [her] to be taken to the local emergency room. She has endured multiple surgeries to her right hand and fingers. She has been through many visits in physical rehabilitation with reported very limited success. She is right hand dominant.
>
> * * *
>
> Ms. Hobart reports daily, severe pain, numbness, swelling and weakness of the right hand and fingers. She further states that she is unable to grip or lift anything with her right hand and when she attempts it she drops it quickly. She does not feel that she could perform any job requiring her to use her right hand.
>
> * * *
>
> It is my opinion, based on this examination using the Fifth Edition AMA Guides, that Ms. Hobart is not capable of performing any gainful employment. My opinion was based only on the allowed injuries in this complaint. She is, therefore, in my professional opinion, permanently and totally disabled.

{¶ 22} 10.  On April 26, 2016, relator filed an application for PTD compensation.  In support, relator submitted the report of Dr. Clendenin.

{¶ 23} 11.  On July 7, 2016, at the commission's request, relator was examined by orthopedist Steven A. Cremer, M.D.  In his six-page narrative report, Dr. Cremer states:

> **History of Present Condition:** Ms. Hobart is 75 years of age. She states that on 01/03/2014, she was working on a conveyor line putting food into trays. She states some pipes broke and her hand became trapped as she tried to move carts out of the way. Her right hand was crushed between two food carts. She was initially evaluated at Austintown Urgent Care. X-rays were obtained. She was placed in a splint and given medication. She was referred to Dr. Jones, orthopedic surgeon. She was placed in physical therapy. She developed numbness and pain in the fingers and locking in the fourth finger. She was diagnosed with carpal tunnel. Testing included plain x-rays and electrodiagnostics. She eventually underwent trigger finger release and carpal tunnel release. Surgeries were performed for right carpal tunnel release and A1 pulley release of the right fourth finger on 11/20/2014. She then underwent post-operative hand therapy. Some improvement was noted, but she still has significant difficulty with her right hand.
>
> **Current Complaints:** A constant burning pain and numbness in the right hand which radiates somewhat into the forearm. She notes peeling of the skin on the fourth digit. The pain is severe. The pain is constant. It is currently treated with Tylenol b.i.d. She does not take opioid analgesics due to allergies. Pain levels are rated 9 out of 10 on a visual analog pain scale. She wears a brace for comfort.
>
> The pain is treated otherwise with ice and heat. She also reports limited range of motion and significant difficulty with grip. She has difficulty holding on to objects.
>
> **Impact on Activities:** Ms. Hobart indicates that she lives alone. She cannot perform previous activities such as crocheting. She has a friend who helps her drive long distances. She gets assistance with meals, as she cooks as little as possible. She is able to do her own laundry. She can do her own shopping. She uses her left hand to carry. Her driving is limited to approximately five miles. She spends most of her time reading and watching television. She notes difficulty brushing her teeth, grasping eating utensils, and with tactile feel of the right hand.

* * *

**Social History:** She lives alone. She is widowed. She has not worked outside the home since her hand injury. She worked for the employer of record for approximately six months. When she was widowed, she decided to supplement her income by getting a job at which she was injured.

* * *

**Physical Examination:** On examination, this is an appropriate-appearing for stated age woman. She is approximately 5 feet 7 inches and 180 pounds. She was cooperative throughout the examination. She removed the wrist splint voluntarily for the evaluation. There is a 1.5 cm scar over the A1 pulley which is moderately tender. Carpal tunnel scar is diffusely tender with some degree of hyperpathia on palpation. Median sensory distribution is grade 3 functionally. Median motor function is grade 4. Ulnar motor and sensory function and radial sensory function are intact in this hand. Wrist extension is 20 degrees actively, wrist flexion 30 degrees, radial deviation 10 degrees and ulnar deviation 15 degrees. The digits show full extension. Fourth digit DIP flexion at 35 degrees, PIP flexion at 60 degrees, and MCP flexion 70 degrees. Second digit flexion 35 degrees DIP joint, 50 degrees PIP joint flexion, and 70 degrees MCP joint flexion. Grip measured on Jamar grip dynamometer was 30% of that obtained on the left.

Elbow and shoulder range of motion are intact. Pulses are intact. There is no palpable triggering actively or passively of the fourth digit; though the tendon is tender to palpation at the area of the scar. Nail beds are intact.

{¶ 24} 12. In his July 7, 2016 narrative report, Dr. Cremer presents a detailed evaluation of relator's impairment based on the "AMA Guides, Fifth Edition." He concludes:

Combining the impairment for the digital range of motion loss as outlined above, range of motion loss at the wrist and motor and sensory loss yields a 43% upper extremity impairment per the combined values table. This is equivalent to a 26% whole person impairment.

> It is noted that grip strength is diminished but given the range of motion, limitations in grip strength cannot be included per the AMA Guides.
>
> Therefore, the total impairment for the injury of 01/03/2014, is 26% whole person.
>
> This individual is at MMI. No active treatment plan is in place. She has had surgical intervention and appropriate postoperative care.

{¶ 25} 13. On July 7, 2016, Dr. Cremer completed a form captioned "Physical Strength Rating."  On the form, Dr. Cremer indicated by his mark that relator is capable of "light work."

{¶ 26} Under "[f]urther limitations, if indicated" and in the space provided, Dr. Cremer wrote in his own hand:

> [Right] hand splint must be worn. No repetitive gripping, pulling or pushing with [right] hand. No weight bearing on right hand.

{¶ 27} 14. Following a September 29, 2016 hearing, an SHO issued an order denying the PTD application.  The order was mailed October 8, 2016.

{¶ 28} 15. On October 19, 2016, relator moved for reconsideration of the SHO's order of September 29, 2016.

{¶ 29} 16. Following a December 13, 2016 hearing, the three-member commission issued an order that exercises continuing jurisdiction and vacates the SHO's order of September 29, 2016.  The commission's order also denies the application for PTD compensation.  The commission's order of December 13, 2016 explains:

> [I]t is the decision of the Industrial Commission the Injured Worker has met her burden of proving the Staff Hearing Officer order, issued 10/08/2016, contains a clear mistake of law of such character that remedial action would clearly follow. Specifically, the Staff Hearing Officer erroneously evaluated the Injured Worker's education as a positive vocational factor when the Injured Worker's eighth grade education, without a GED, is properly classified as a limited education in accordance with Ohio Adm.Code 4121-3-34(B)(3)(b)(iii). Therefore, the Commission exercises continuing jurisdiction pursuant to R.C. 4123.52 * * * in order to correct this error.

It is the order of the Commission the Injured Worker's Request for Reconsideration, filed 10/19/2016, is granted, and the order of the Staff Hearing Officer, issued 10/08/2016, is vacated. Notwithstanding the decision to grant the Injured Worker's Request for Reconsideration, it is the order of the Commission the IC-2, Application for Compensation for Permanent Total Disability, filed 04/26/2016, is denied.

The Commission finds the allowed conditions do not render the Injured Worker permanently and totally disabled.

The Injured Worker sustained injuries to her dominant right hand, which required two surgical procedures. The Commission relies upon the opinion from Steven Cremer, M.D., dated 07/07/2016, to find residuals from this injury prevent the Injured Worker's return to work at her former position of employment. Dr. Cremer specified the Injured Worker remains capable of light-duty work so long as the Injured Worker wears a splint and avoids repetitive gripping, pulling, or pushing with the right hand. Dr. Cremer also advised against any weight bearing with the right hand.

Because the Injured Worker can no longer perform her former position of employment, an analysis of the Injured Worker's non-medical disability factors is necessary.

The Injured Worker is 76 years old, and ordinarily a person beyond the typical age of retirement would be expected to struggle to adapt to new work situations or to do work in competition with others. However, the Injured Worker reentered the workforce at the age of 72, and she testified she intended to work, like her mother, until the age of 85. The Commission therefore classifies the Injured Worker's age as a neutral vocational factor.

As indicated above, the Injured Worker has a limited education with schooling through the eighth grade. The Injured Worker indicated on the IC-2 that she can read, write, and perform basic math; at hearing, the Injured Worker testified she left school to go to work rather than because of any academic difficulties. The Commission notes the Injured Worker completed the IC-2 on her own, which demonstrates the Injured Worker's ability to complete an application, understand written questions, and respond coherently in writing. The commission further notes the Injured Worker has made no effort to improve her education. The

> Commission classifies the Injured Worker's education as a neutral vocational factor.
>
> The Injured Worker only listed her former position of employment on the IC-2 as a food plater. At hearing the Injured Worker testified she also held jobs at a dairy, drove a school bus, and served meals at a senior citizens center, besides the Injured Worker's many years as a homemaker. While these jobs were either unskilled or semi-skilled positions, the Injured Worker's work history demonstrates her ability to acquire work, maintain employment, and develop job skills through on-the-job training. The Commission therefore classifies the Injured Worker's work experience as a positive vocational factor.
>
> The Injured Worker has not participated in a rehabilitation program, and she has not sought further education or training to enhance her employability. Permanent total disability compensation is compensation of last resort, and the Commission finds the Injured Worker remains capable of work consistent with the restrictions enumerated by Dr. Cremer.

{¶ 30} 17. On May 4, 2017, relator, Mary C. Hobart, filed this mandamus action.

Conclusions of Law:

{¶ 31} The main issue is whether the reports of Dr. Cremer provide some evidence on which the commission exclusively relied in determining residual functional capacity. Ohio Adm.Code 4121-3-34(B)(4).

{¶ 32} Finding that the reports of Dr. Cremer do not provide some evidence on which the commission relied in determining residual functional capacity, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.

### Basic Law

{¶ 33} Ohio Adm.Code 4121-3-34 sets forth the commission's rules for the adjudication of PTD applications. Ohio Adm.Code 4121-3-34(B) sets forth definitions.

{¶ 34} Ohio Adm.Code 4121-3-34(B)(2) is captioned "Classification of physical demands of work." Thereunder, the code provides:

> (a) "Sedentary work" means exerting up to ten pounds of force occasionally (occasionally: activity or condition exists up to one-third of the time) and/or a negligible amount of force

frequently (frequently: activity or condition exists from one-third to two-thirds of the time) to lift, carry, push, pull, or otherwise move objects. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

(b) "Light work" means exerting up to twenty pounds of force occasionally, and/or up to ten pounds of force frequently, and/or a negligible amount of force constantly (constantly: activity or condition exists two-thirds or more of the time) to move objects. Physical demand may be only a negligible amount, a job should be rated light work: (i) when it requires walking or standing to a significant degree; or (ii) when it requires sitting most of the time but entails pushing and/or pulling or [sic] arm or leg controls; and/or (iii) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.

{¶ 35} In *State ex rel. O'Brien v. Cincinnati Inc.*, 10th Dist. No. 07AP-825, 2008-Ohio-2841, at ¶ 9-10, the court summarized relevant case law:

Initially, it is important to note that a medical report that identifies the worker's exertional category as defined in the Ohio Administrative Code and does not include additional opinions regarding specific restrictions on sitting, lifting, standing, and so forth is still sufficient to constitute some evidence. *State ex rel. Ace v. Toyota of Cincinnati Co.*, Franklin App. No. 03AP-517, 2004 Ohio 3971, at P30. Thus, a medical report may constitute evidence on which the commission may rely when the physician simply opines the claimant was limited to "sedentary work" and provides no further details of the claimant's various functional restrictions. *Id.*

On the other hand, the commission cannot simply rely on a physician's "bottom line" identification of an exertional category without examining the specific restrictions imposed by the physician in the body of the report. See *State ex rel. Owens-Corning Fiberglas Corp. v. Indus. Comm.*, Franklin App. No. 03AP-684, 2004 Ohio 3841; and *State ex rel. Howard v. Millennium Inorganic Chemicals*, Franklin App. No. 03AP-637, 2004 Ohio 6603. In both *Owens-Corning* and *Howard*, the doctor indicated that the injured worker could perform at a certain strength level, and yet, the rest of the

report indicated greater restrictions on the injured worker that would actually render him incapable of performing the strength level work that the doctor had indicated he could perform. This court held in *Owens-Corning* and *Howard* that the commission cannot simply rely upon a determination that an injured worker can perform at a certain strength level; rather, the commission must review the doctor's report and actually make certain that any physical restrictions the doctor listed correspond with an ability to actually perform at the exertional level indicated by the doctor.

## Analysis

{¶ 36} Analysis begins with the observation that relator has no industrial injury or impairment to her non-dominant left upper extremity. In rendering an opinion on the "Physical Strength Rating" form regarding the Ohio Adm.Code 4121-3-34(B)(2) classification of physical demands of work, the examining physician should consider to what extent, if any, the non-dominant left upper extremity might be useful in the performance of sedentary and/or light work. Here, Dr. Cremer does not directly address how the left upper extremity might assist the right upper extremity in the performance of the physical demands of work.

{¶ 37} Based solely on the reports of Dr. Cremer, it is difficult to see how the severe right upper extremity impairment alone permits any light work.

{¶ 38} Numerically, Dr. Cremer opined that relator has a 43 percent upper extremity impairment suggesting severe impairment of the dominant upper extremity.

{¶ 39} Significantly, under "Current Complaints," and "Impact on Activities," Dr. Cremer reports "[s]he also reports limited range of motion and significant difficulty with grip. She has difficulty holding on to objects." Further, Dr. Cremer notes "[s]he uses her left hand to carry." He additionally notes "[s]he notes difficulty brushing her teeth, grasping eating utensils, and with tactile feel of the right hand."

{¶ 40} Significantly, nowhere in his reports does Dr. Cremer even suggest that he doubts the truthfulness of relator's complaints. *See State ex rel. Logan Clay Prods. v. Indus. Comm.,* 10th Dist. No. 14AP-808, 2015-Ohio-5235, ¶ 42 (the doctor's assessment of the complaints in light of his examination can play a significant part in the doctor's disability opinion).

{¶ 41} Relator's description of the injury's impact on her daily activities is clearly consistent with the limitations Dr. Cremer wrote in his own hand on the "Physical Strength Rating" form.

{¶ 42} It can be further noted that Dr. Cremer's command that there shall be "no repetitive gripping, pulling or pushing with [right] hand" is inconsistent with the first sentence of the definition of light work:

> "Light work" means exerting up to twenty pounds of force occasionally, and/or up to ten pounds of force frequently, and/or a negligible amount of force constantly (constantly: activity or condition exists two-thirds or more of the time) to move objects.

{¶ 43} Exerting up to 20 pounds occasionally and/or up to 10 pounds frequently and/or a negligible amount of force constantly, as the definition provides, is inconsistent with Dr. Cremer's restriction against "repetitive gripping, pulling or pushing."

{¶ 44} Moreover, the light work definition addresses work "at a production rate pace" something relator clearly cannot do with her right upper extremity.

{¶ 45} Given the above analysis, it is clear that the reports of Dr. Cremer fail to provide some evidence to support the commission's determination that the industrial injury to the right upper extremity permits any light work. Accordingly, the commission abused its discretion by relying on the reports of Dr. Cremer in its determination of residual functional capacity.

{¶ 46} Because the commission abused its discretion in determining residual functional capacity, it would be premature for this court to review the commission's non-medical analysis. *State ex rel. Showa Aluminum Corp. of Am. v. Indus. Comm.,* 176 Ohio App.3d 540, 10th Dist. No. 07AP-729, 2008-Ohio-2951, citing *State ex rel. Corona v. Indus. Comm.,* 81 Ohio St.3d 587 (1998); *State ex rel. Nickoli v. Indus. Comm.,* 10th Dist. No. 08AP-349, 2009-Ohio-243, ¶ 8, citing *Corona.*

{¶ 47} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate its December 13, 2016 order to the extent that the application for PTD compensation is denied, and, in a manner consistent with this magistrate's decision, enter a new order that adjudicates the PTD application.

/S/ MAGISTRATE
KENNETH W. MACKE

## NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).